**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| WALTER JOSEPH COOK III, *Petitioner-Appellant*, | No. 17-17257 |
| v. | D.C. No. 3:15-cv-06343-WHA |
| SCOTT KERNAN, *Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted March 27, 2019
San Francisco, California

Filed January 21, 2020

Before: Consuelo M. Callahan, N. Randy Smith,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge Callahan;
Dissent by Judge Murguia

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's denial of Walter Joseph Cook, III,'s 28 U.S.C. § 2254 habeas corpus petition challenging his California state conviction for three counts of first-degree murder, in an appeal in which Cook claimed, *inter alia*, that the state's reliance on his confession prejudicially violated his constitutional rights.

Cook asserted that his statements to police were unlawfully obtained in two ways: that he was unable to understand his *Miranda* rights from the outset of his interrogation and thus did not knowingly and intelligently waive them, and that his confessions were coerced based on the totality of the circumstances as established by the existing record.

Applying AEDPA deference, the panel held that:

- based on the facts that Cook was repeatedly warned of his *Miranda* rights, expressly acknowledged the warnings, and offered coherent and knowing answers to the officers' questions, the California Supreme Court had a reasonable basis to reject Cook's challenge to the validity of his *Miranda* waiver.

- the California Supreme Court had a reasonable basis to conclude that Cook's confession was voluntary

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because Cook fails to show how this conclusion under the totality of the circumstances is "inconsistent with the holding in a prior decision of the [United States] Supreme Court."

The panel held that Cook is not entitled under AEDPA to an evidentiary hearing into his allegation that an officer threatened him at gunpoint during his interview, and that the district court did not abuse its discretion in denying his request for one, because his failure to develop the factual basis for the claim in state court proceedings was due to his own lack of diligence.

The panel addressed remaining claims in a concurrently filed memorandum disposition.

In a concurring opinion, Judge Callahan wrote that if the panel had needed to reach the question of whether Cook was prejudiced by the admission of his statements, she would agree with the district court that the California Supreme Court could have reasonably denied Cook's claim on the ground that any error was harmless.

Dissenting, Judge Murguia disagreed with the majority's conclusion that the California Supreme Court could have reasonably denied habeas relief on the basis that Cook (1) knowingly and intelligently waived his *Miranda* rights; and (2) suffered no prejudice from the improper admission of his unlawfully obtained confession and other incriminating statements.

## COUNSEL

Cormac Early (argued), Jones Day, Washington, D.C.; Craig Stewart and Kelsey Israel-Trummel, Jones Day, San Francisco, California; for Petitioner-Appellant.

Sarah J. Farhat (argued), Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Respondent-Appellee.

## OPINION

CALLAHAN, Circuit Judge:

In 1994, a California jury convicted petitioner, Walter Joseph Cook, III, of three counts of first-degree murder, along with a special circumstance of multiple murders under California law, and sentenced him to death. Following his state habeas proceeding over a decade later, Cook's sentence was reduced to life without the possibility of parole on the ground that he was intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002). Cook subsequently sought federal habeas relief from his conviction on multiple grounds. The district court denied his habeas petition but granted a certificate of appealability as to four issues, only one of which we address in this opinion: whether the state's reliance on Cook's taped confession

resulted in a prejudicial violation of his constitutional rights.[1]

Cook's claim is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). Applying the AEDPA standard of review, we deny relief because the state habeas court could have reasonably concluded that Cook's confession was not obtained in violation of his constitutional rights.

## I.

## A.

Cook's convictions emerge from three murders that occurred over the span of four months in 1992 in East Palo Alto, California, where Cook was a local dealer of crack cocaine.[2]

The murder of Earnest Sadler occurred in the early morning of February 9, 1992. Around 4:00 a.m., police found Sadler's body lying on the pavement in a residential neighborhood in East Palo Alto. Sadler's head was severely battered, and three bloodstained and broken pieces of wooden board were found nearby. Sadler's distinctive shoe prints were also visible on the damp soil in the front yard of a nearby house. When officers initially interviewed the

---

[1] We address Cook's remaining claims in a concurrently filed memorandum disposition.

[2] The facts and evidence presented at trial in support of Cook's convictions are detailed at length in the California Supreme Court's opinion on direct review, *People v. Cook*, 139 P.3d 492 (Cal. 2006).

eleven occupants of the residence, none admitted to having seen Sadler killed.

It was only months later that several occupants of the house and other witnesses admitted that they knew Cook had beaten Sadler to death. Shawnte Early (who had been Cook's girlfriend at one point) told police that she saw Cook beating Sadler with a stick while Sadler was on the ground, and that she tried to intervene by coaxing Cook into her car and driving him around the corner, only to have Cook jump out of her car and resume his brutal attack on Sadler. At trial, Early repudiated her taped interview, which was played for the jury. Earnest Woodward, a resident of 2250 Menalto, testified that he woke up that night to see Cook engaged in a fistfight with Sadler, and Woodward told the combatants to move down the street. Velisha Sorooshian testified that she was sitting with Leonard Holt in her car, smoking a pipe of crack cocaine, near 2250 Menalto that night when Cook pulled alongside her and laughingly asked her to see if the man lying in the street was all right. Shannon Senegal (Cook's cousin) testified that, the day after Sadler's death, Cook told him he had "beat someone down last night" and identified his victim as Sadler. Woodward and Senegal were either in custody or serving prison sentences at the time of trial, and Sorooshian also had a criminal record.

The murder of Michael Bettencourt occurred sometime between midnight and 1:00 a.m. on February 14, 1992. A group of drug dealers and friends was gathered on a residential street in East Palo Alto, which was known as a site for illegal drug sales. Bettencourt, an outsider apparently wanting to buy drugs, arrived in the middle of the street in his gold Thunderbird car and was immediately surrounded by potential sellers, including Cook. Steven Sims (another seller) stuck his arm through the open driver-

side window, but was jostled, causing him to drop his rock of cocaine inside Bettencourt's car. When Sims opened the driver's door to look for the fallen rock, he heard Cook—who was standing behind him, holding a nine-millimeter automatic pistol—tell Bettencourt to return the rock or pay for it. Sims then heard Cook yell, "Get back, get back," and when Sims stepped away, he saw Cook shoot Bettencourt once in the leg, pause, then unload the "clip in the nine," shooting Bettencourt repeatedly.

Once he stopped shooting, Cook jumped into Nathan Gardner's car and rode for a few blocks before he got out. During the short ride, Gardner asked Cook why he shot Bettencourt, and Cook said it was because Bettencourt had tried to "gaffle"—meaning to steal from—him. The next day or so, when Sims encountered Cook again and asked about the shooting, Cook replied that Bettencourt "should have give[n] me my money or my rock back." Bettencourt was found by police, dead in his car, with the driver's door open. The responding officer was unable to obtain information from anyone in the neighborhood about the shooting. Numerous shell casings were found in the street next to the car door, and a later forensic examination determined that eleven of the shell casings had come from a single gun.

The murder of Ronald Morris occurred on the afternoon of May 21, 1992. Cook, Senegal, and Lavert Branner were hurriedly leaving the parking lot of University Liquors in a Nova car (driven by Senegal) when they passed Sharoon Reed and three of her friends, who were also leaving the parking lot in their car. One of the men in the Nova told the women to "hurry up and move," and as the women slowed their car to let the Nova pass, Cook displayed a gun to them. The women followed the Nova at a distance as they headed

to a birthday party on East O'Keefe Street in honor of their friend, Morris, also known as "Fat Man."

When the cars arrived on East O'Keefe, Morris had just parked his car and hailed down the Nova. Senegal made a U-turn and pulled the Nova next to Morris. As Senegal began talking to Morris, Cook (who was in the front passenger seat) suddenly leaned across Senegal and fired multiple shots at Morris, announcing, "I told you I will get your punk ass back." According to Senegal, Cook harbored a grudge against Morris based on an incident about a week earlier, when an armed Morris had mocked Cook for being unarmed. Reed testified that, from her viewpoint in the women's car, she overheard Morris say, "Damn, you all strapped," as he looked into the Nova, and then saw him suddenly turn away just before multiple shots were fired.

According to a pathologist at trial, Morris had five bullet wounds in his heart and lungs, any one of which was "potentially fatal." Various nine-millimeter cartridge casings were recovered from the pavement where Morris fell, and were later compared to the nine-millimeter casings recovered from the Bettencourt murder. A San Mateo County Sheriff's criminalist testified that he could not determine with certainty whether both sets of casings had come from the same weapon, possibly because those from the earlier killing were aluminum while those from the later killing were brass. A day after the Morris murder, Cook threw his gun off the Dumbarton bridge and subsequently left the area.

## B.

On June 26, 1992, Cook was arrested at his mother's home in Lawton, Oklahoma, on a California warrant. He was transported to the local jail, where he was interviewed

by East Palo Alto Police Sergeant Gregory Eatmon and Inspector Bruce Sabin of the San Mateo District Attorney's Office. The interview lasted approximately seven hours, from around 7:00 p.m. that night to around 2:00 a.m. the next morning.

At the beginning of the interview, Inspector Sabin read Cook his *Miranda* rights and then asked, "Do you understand that Walter?" Cook responded, "Yeah." Sabin then asked, "Okay. Do you have any questions about that? That's a yes or no," to which Cook responded, "No." After this confirmation from Cook, the investigators proceeded to question Cook about his background, his family, and, eventually, his whereabouts on the day of the Morris murder. During these first few hours of his videotaped interview, Cook generally appeared calm, even conversational at times, as he answered the investigators' questions; at other times, he also seemed slightly confused, and his responses seemed unfocused and difficult to follow.[3] When the investigators began to question Cook about Morris, Cook initially maintained that he was at his cousin's house the night of the murder and only heard about it after the fact.

Almost two hours into the interview, around 8:57 p.m., the investigators shifted their approach to a more direct verbal confrontation about the Morris murder. They told

---

[3] When asked for his date of birth and age at the start of the investigation, Cook stated that his birthdate was September 25, 1971 (which would have made him twenty years old), but then stated he was nineteen years old when asked for his age. When Sabin pointed out the inconsistency between his responses, Cook responded with, "that's what, what my mother told me, so." The district court interpreted this colloquy as one of the first "signs that Cook was either seriously confused, or otherwise mentally incompetent." Cook was actually eighteen years old at the time of his interview.

Cook, "[E]verything you been giving us up till now has been bullshit," and claimed they had multiple witnesses, fingerprint evidence, and shell casings all pinning him to the murder. In an effort to persuade Cook to confess, the investigators made statements such as: "[N]ow's the time for you to tell the truth son, the absolute truth"; "If Fat Man did something to you that made you shoot him, we want to hear that"; and, "[N]ot only you're going to look like a killer, but you're going to look like a liar on top of it." Cook responded to these statements with mostly one-word responses, eventually telling the investigators, "I really can't say too much about it 'cause um, I'm not going to endanger my family's life." The investigators continued to insist that Cook "tell the truth," until Cook finally stated:

> I don't, anything I say would endanger my family life, I'd rather just, whatever's going to happen to me is going to happen anyway. I'm either being . . . you know what I'm saying, if you got all this evidence on me, either way, I'd say whatever, yes or no, yes or no, I'll either get the electric chair, 25 to life, so, you know what I'm saying, it didn't, it really shouldn't even matter what I say.

At this point, Cook had not explicitly admitted to shooting Morris, but the investigators continued to ask him why he killed Morris and whether it was because Morris had threatened him. Their questioning led Cook to discuss various incidents where he had felt threatened by or experienced conflict with Morris. Around 9:34 p.m., in response to the investigator's prompting, "[N]ot only is [Morris] disrespecting you, but he's threatening you for no reason, you didn't do anything to him, did you? Did you ever do anything to him?," Cook began to cry, replying, "No,

I never do nothing to nobody, I try to be everybody friend. I can't work 'cause I live on another part." As Sabin continued to question Cook about the Morris shooting, Cook tearfully reiterated his fears about endangering his family, making statements such as: "I'm in for it regards if I say something or not . . . if I tell you something, then, put my family life in danger, I'd rather something just happen to me"; "It shouldn't really matter, whatever I say now, you said I'm guilty . . . you got all this stuff that I'm in it, so . . . regardless of what I say, you know what I'm saying, it's not going to happen . . . if you all plan on killing me or whatever . . . I'm doing electric chair or 25 to life . . . it just don't matter now"; "And then, after I tell you all the truth, whatever it is, who, you know what I'm saying, I got to face the consequences of what happened to, what if somebody kill my father and them."

At one point, Sabin asked Cook, "[A]re you telling us you didn't shoot this guy, is that what you're saying?," and Cook answered, "I didn't say I did or I didn't." Sabin and Eatmon emphasized again all the evidence they had linking Cook to the murder, and told Cook he only needed to explain his motive. Cook finally responded, "The only thing I can tell you, what the truth is, I remember, the last thing I remember, he came up to the car and he, I forgot what he said, and last thing I just like blanked out, that's the last thing I remember." As the investigators pressed Cook for additional detail, Cook admitted that he was in the car with Branner and Senegal and had a gun with him, but continued to maintain that he could not remember what happened after Morris approached the car because he "blank[ed] out."

Cook did not provide substantially more information after this admission, despite continued questioning over the next two hours. At one point, Sabin expressed frustration

with Cook's responses, stating, "I hate to say this Walter, I really do, because we've come a long way . . . since when you were totally telling us bullshit, okay . . . . But, if you were sitting over here, being me, would you believe that?" Cook responded, "That's, that's what happened, I'm telling you, I'm telling you everything that I remember."

Around 11:13 p.m., in response to a question about why he went to therapy as a child, Cook suddenly began to sob loudly and talk about the physical abuse of his mother by his father when he was younger.  Faced with an increasingly emotional Cook, Sabin and Eatmon offered him a drink and unsuccessfully tried to reengage him in questions about Morris.  Instead of responding to questions about Morris, however, Cook continued to discuss his abusive childhood, while still crying and making statements such as: "I don't care, they can kill me, do whatever they want, I don't care no more"; "I hope they kill me or whatever, I don't want to worry about waking up every night, just thinking about got to help my mother, and I can't do nothing to stop it . . . let them kill me, I don't care, I have nothing to live for, nobody even care about me anyway so, I mean, it's better if I'm gone"; "I don't care what happens to me, kill me, I'd be more of a big heavy burden."  By 11:38 p.m., the investigators decided to take a break to allow Cook to calm down and escorted him back to his cell.**[4]**

---

**[4]** In his state habeas petition, Cook alleged for the first time that, during this half-hour break in his interview, Sergeant Eatmon threatened him at gunpoint.  According to Cook, as Eatmon escorted Cook from his cell to the interrogation room, Eatmon pulled Cook into a restroom, held a gun to Cook's head, and threatened to harm him if he did not confess to killing Bettencourt.  Cook did not offer a sworn affidavit personally attesting to this allegation in either his state or federal habeas petition, nor do the affidavits from trial counsel in response to his ineffective

The taped interview resumed around 12:10 a.m. Sabin reminded Cook again of his *Miranda* rights:

> SABIN: Okay, Walter, when we initially started this interview we read you your *Miranda* rights, do you remember those?
>
> COOK: Uh-hum.
>
> SABIN: Okay. And you still want to talk to us is that correct?
>
> COOK: Yeah, it don't matter.
>
> SABIN: Okay. I want you to understand that, if at some point in time you don't want to talk to us anymore, say so, okay? Understand?
>
> COOK: Yes.
>
> SABIN: Okay. If you want us to stop at some point in time and take a break, say so with [sic] that alright?
>
> COOK: Uh-hum.
>
> SABIN: I want you to be totally comfortable with this, okay?

assistance of counsel claims mention this allegation. The California Supreme Court denied Cook's petition without granting his request for an evidentiary hearing on this claim.

COOK:  Uh-hum.

Sabin then began questioning on the Bettencourt murder, which led to a somewhat abrupt confession from Cook:

> SABIN:  Alright.  What we want to talk to you about Walter is an incident that happened on February 14th, 1992, on Alberni Street. Alberni near Jervis, do you have any idea what I'm talking about?
>
> COOK:  Uh-hum.
>
> SABIN:  Okay.  Do you want to tell me what you know about it?
>
> COOK:  Yeah, I did it, I actually don't know why.  And that's all you need to know.  Well, I don't care.

Sabin pressed for more information, but Cook declined to provide additional detail, asserting that he could not remember or did not know what happened, but knew that he committed the shooting.**[5]**  The questioning continued until about 1:42 a.m., when Eatmon gave Cook a glass of water and aspirin at Cook's request, and Sabin left to use the restroom.  Around 1:50 a.m., after Cook began coughing up

---

**[5]** Cook's responses to various questions included: "Well, the whole plan is, everyone know that I did it or not, I did it so, you all can just shoot me or whatever, it don't matter."; "Well, I don't really know.  The only thing I know that I, I shot the dude, that's all I know."; "I don't, I don't know what happened. Last thing I remember, I know I shot the guy, that's all I remember happening."; "No, I don't remember nothing. The only thing, the only thing I remember, I know I shot the dude, that's all I remember."

his aspirin, the investigators decided to terminate the interrogation for the night.

The interview resumed the next day around 12:49 p.m. Sabin again asked Cook if he remembered "the *Miranda* rights I read to you yesterday when we first met?" Cook answered, "Um, not really." Sabin then reread the *Miranda* rights to Cook and asked if he had any questions. Cook responded, "So, therefore that um, like, when you all talk to me I'm supposed to have an attorney here or something?" Sabin answered, "No, you have the right to have one here if you want," which prompted this exchange:

> COOK: Is that the only time you could have an attorney to be able, when you go to court?
>
> SABIN: You can have an attorney present any time during these, these proceedings.
>
> COOK: I didn't know that.
>
> SABIN: Okay, well, do you remember me reading that off to you yesterday?
>
> COOK: Not really, but I remember you was reading something about my rights.

Cook then told the investigators he wanted to talk to his mother before he continued speaking with them. Sabin asked Cook a few more questions as to whether he understood his rights the day before. Cook answered, "No, I, I didn't know that . . . you could have a lawyer . . . while you guys talk to me. I didn't know that," "I remember you telling me that I didn't, like to remain silent," and "Yeah, I thought I did [understand], but I guess I didn't, I didn't know

that like, when you guys talked to me that, I could have a lawyer here."

After Cook was given an opportunity to talk to his mother, he returned to the interview at 6:20 p.m. and informed the investigators he did not want to talk to them because his mother "told me I should wait till I get back to California, we got to talk to my lawyer." The officers subsequently ended the interview.[6]

## C.

At the time of his arrest and interview, Cook was eighteen years old. According to Dr. William Lynch, a neuropsychologist who evaluated Cook prior to trial, Cook's "full scale" IQ was 89 and his intelligence was "low average overall . . . with verbal and performance abilities falling at the extreme low end of the average range." Dr. Zakee Matthews, a clinical psychologist who also evaluated Cook prior to trial, opined that Cook suffered from PTSD. Neither Dr. Lynch nor Dr. Matthews reviewed the transcripts or videotape of Cook's interrogation as part of their pre-trial evaluations.

Over a decade later, at the request of Cook's state habeas counsel, Dr. Matthews reviewed Cook's videotaped interview and opined that "it was extremely unlikely Mr. Cook could have meaningfully understood the admonition regarding his legal rights as expressed in the language and manner used by the interrogating officers."

---

[6] On June 30, 1992, Cook submitted to another interview with two different detectives from the San Mateo County Sheriffs' Office, during which he confessed to killing Earnest Sadler. Cook was not read his *Miranda* warnings at this interview, and these statements pertaining to Earnest Sadler were not used at trial.

According to Dr. Matthews, "Cook's spontaneous questions and comments . . . confirm that he did not have an adequate comprehension of his rights necessary to make a knowing and intelligent waiver."

In 1992, Dr. George Wilkinson was retained by the defense team to perform a forensic pretrial evaluation of Cook, which included a review of the audiotaped recordings and "a half-hour videotape" of the interrogation. In his pretrial evaluation, Dr. Wilkinson concluded that Cook "had life-long attentional and learning disabilities that reduced his performance even below his measured intelligence level of borderline to low average." He also noted "a pattern of deficits affecting memory and information-processing that rendered Mr. Cook vulnerable, particularly when under stress, to becoming overwhelmed and confused. Individuals with such impairments are dependent upon cues and guidance from others to maintain a useful and functional organization of information." In 2005, at the request of state habeas counsel, Dr. Wilkinson reviewed additional material and rendered an updated opinion that, had he been asked to do so at trial, he would have opined that "the circumstances of the interrogation, including Mr. Cook's neuropsychological and intellectual impairments and the effects of his trauma-based symptoms, prevented him from knowingly and intelligently understanding and waiving his right to remain silent."

Two other mental health experts also evaluated Cook years after trial and provided declarations in support of his 2005 state habeas petition. Dr. Myla Young concluded that Cook's full scale IQ was 83 with a "level of performance . . . similar to that demonstrated by most children with an age equivalence of 9.9 years." Based on her testing, Dr. Young concluded that "the impairments that Mr. Cook

demonstrates in 2004 would have been present at the time of the offenses and his trial," and noted that her conclusions were "consistent with those reported by Dr. Lynch in 1994."

Dr. George Woods provided an extensive report in 2005, stating that

> [Cook] is easily distracted by external stimuli and internal dialogue, cannot inhibit impulsive response selection or retrieve information accurately, and readily incorporates cues, prompting and direction from others into his strategies for recalling information. Under the best of circumstances these cognitive deficits render Mr. Cook vulnerable to suggestibility and confabulation, i.e., adopting a created or suggested memory to fill a void where only partial or no memory exists.

Dr. Woods further opined that "Cook's repeated inability spontaneously to offer details of events, to confidently confirm or deny suggested details or to indicate other than a lack of memory for events are strong indications that independent recollection was not accessible to him." According to Dr. Woods, "The methods of interrogation and Mr. Cook's evolving acquiescence in acknowledging possible, probable, or even actual involvement in the offenses are accompanied by so many symptomatic signs of dissociation and confabulation, the videotape could serve as a didactic instrument for permitting clinicians to observe the psychological dynamics that might lead to a false confession."

D.

At Cook's trial in 1994, the prosecution presented multiple witnesses linking Cook to each murder, ballistics evidence, and medical evidence, as well as Cook's taped confession to the Bettencourt and Morris murders. The jury convicted Cook of three counts of first-degree murder in violation of California Penal Code § 187, with a special allegation of multiple murders under California Penal Code § 190.2(a)(3), amongst other offenses. A month later, the jury returned a death verdict. In August 2006, the California Supreme Court issued its opinion on direct appeal and affirmed Cook's convictions and death sentence in full. *People v. Cook*, 139 P.3d 492 (Cal. 2006).

In August 2005, while his appeal was still pending review, Cook filed a habeas petition with the California Supreme Court, raising seventeen claims, which included his claim that the state's reliance on his confession violated his constitutional rights. The petition also raised a number of new factual allegations, including the allegation that Sergeant Eatmon had threatened Cook at gunpoint during the interview, and requested an evidentiary hearing into the allegations.

On December 15, 2010, the California Supreme Court issued its one-page decision on Cook's habeas petition. The California Supreme Court first ordered the Director of the Department of Corrections and Rehabilitation to "show cause in the San Mateo County Superior Court . . . why petitioner's death sentence should not be vacated and petitioner sentenced to life without the possibility of parole on the ground that he is mentally retarded within the meaning of *Atkins v. Virginia* . . . ." It then summarily denied "[a]ll of the remaining claims in the petition . . . on the merits." The California Supreme Court also invoked

procedural bars for a number of Cook's claims, including the claim that "his statements to police were obtained in violation of his constitutional rights."

In November 2014, the San Mateo County Superior Court found that Cook met diagnostic criteria for intellectual disability within the meaning of *Atkins*, 536 U.S. 304, vacated the death sentence, and resentenced Cook to life in prison without the possibility of parole.

In December 2015, Cook filed his federal habeas petition with the district court, raising seven claims, each of which had been previously raised in his state habeas petition. Cook also moved the district court for an evidentiary hearing to look "into all disputed issues of fact material to his Petition for Habeas Corpus," including his claim that Sergeant Eatmon threatened him at gunpoint into confessing to the Bettencourt murder.

The district court denied Cook's habeas petition. It denied Cook's motion for an evidentiary hearing because "[a]ll issues presented by his petition can be resolved on the record" and "[o]ther allegations would not entitle Cook to relief even if proven true. . . ." In regard to Cook's claims pertaining to his statements to police, the district court concluded that Cook's *Miranda* waiver was not knowing and intelligent,[7] but the admission of the confession at trial was

---

[7] According to the district court, "[g]iven substantial evidence of [Cook's] inability to comprehend his rights, including his youth, low IQ, psychological deficiencies, inability to follow verbal instructions, dissociation, and his statements to interrogators that he did not understand he had the right to have a lawyer present at his interrogation, a contrary conclusion is unreasonable."

not prejudicial because the remaining evidence still supported the Morris and Bettencourt murder convictions.[8]

## II.

This court reviews de novo the district court's denial of habeas relief. *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018).

As amended by AEDPA, 28 U.S.C. § 2254(d) requires "highly deferential" review of state court adjudications, "demand[ing] that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). A federal court's authority to grant habeas relief is limited to instances where the state court's ruling was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court adjudicated the claim on the merits, 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding." *Id.* § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of

---

[8] Having found a *Miranda* violation, but no prejudice, the district court declined to reach the question of whether Cook's confession was involuntary.

[the Supreme] Court and nevertheless arrives at a result different from [this] precedent." *Id.* at 405–06.

A state court's decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (quoting *Williams*, 529 U.S. at 410); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.") (citing *Williams*, 529 U.S. at 410). In other words, "[a]s a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Similarly, in regard to claims under § 2254(d)(2), a state court's factual determination is not "unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about a factual finding, "on habeas review that does not suffice to supersede" the state court's determination. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).

III.

Cook claims that the state's reliance on his confession prejudicially violated his constitutional rights, because his statements to police were unlawfully obtained in two ways. First, Cook asserts he was unable to understand his *Miranda* rights from the outset of his interrogation and thus did not knowingly and intelligently waive them. Second, Cook alleges that his confessions were coerced based on the totality of the circumstances as established by the existing record.

The California Supreme Court summarily denied this claim "on the merits."[9] Despite the state court's lack of explanation for its denial of relief, our review is still subject to AEDPA. *See Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) ("Section 2254(d) applies even where there has been a summary denial.").

> Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which

---

[9] The California Supreme Court also found this claim procedurally barred under *In re Seaton*, 95 P.3d 896 (Cal. 2004). While this court has not yet squarely addressed whether *In re Seaton* provides an "adequate and independent" state procedural rule that bars federal habeas review, we need not decide this question given the state's failure to plead the existence of such a bar to Cook's claim. *See Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). In fact, at oral argument, the state expressly asserted that no procedural bar applies to this claim. Accordingly, we consider any procedural bar waived and proceed to review the merits of Cook's claims regarding the validity of his *Miranda* waiver and the voluntariness of his confession under the AEDPA standard.

> of the elements in a multipart claim it found
> insufficient, for § 2254(d) applies when a
> 'claim,' not a component of one, has been
> adjudicated.

*Richter*, 562 U.S. at 98. Thus, in reviewing the California Supreme Court's summary denial of Cook's claim, we must determine: (1) "what arguments or theories supported or . . . could have supported . . . the state court's decision"; and (2) "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. at 102. Given this deferential standard, Cook is not entitled to federal habeas relief on his claim because fairminded jurists could disagree as to whether Cook's confession was obtained in violation of his constitutional rights.

## A.

Before proceeding with a custodial interrogation, a suspect must be advised of his *Miranda* rights: that he "'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)); *see also Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). A suspect's waiver of these rights is valid only if it is "voluntary, knowing and intelligent." *Miranda*, 384 U.S. at 479. Thus, the waiver inquiry "has two distinct dimensions"—first, it must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, it must be "made with a full awareness of both the

nature of the right being abandoned and the consequences of the decision to abandon it." *Thompkins*, 560 U.S. at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A waiver satisfies this two-part standard only "if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

On the night of Cook's arrest and initial interview, he was advised by police of his *Miranda* rights—three times in fact. Each time, Cook readily affirmed that he understood his rights and wanted to speak anyway, and did so without any apparent form of intimidation, coercion, or deception from the investigators providing the warnings. Each time the investigators read or reminded Cook of his *Miranda* rights during the interview, they also followed up with additional questions to ensure that Cook understood the rights he was read and wanted to waive them and proceed with the questioning, which—from at least an objective vantage point—Cook did. In that respect, the record supports the conclusion that Cook's *Miranda* waiver was voluntary.

However, the mere fact "that a *Miranda* warning was given and the accused made an uncoerced statement, . . . standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights." *Thompkins*, 560 U.S. at 384 (quoting *Miranda*, 384 U.S. at 475). "The prosecution must make the additional showing that the accused understood these rights[,]" *id*., meaning that his waiver was also knowing and intelligent. "The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience,

and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Here, the record evidence contains some indication that Cook did not understand his right to have an attorney present during his interrogation—and thus did not knowingly and intelligently waive this particular right. These factors include: the weight of the mental health evidence regarding his cognitive inability to understand the rights warnings; the occasional indications of his confusion or lack of comprehension during the interview; and the statements he made on the second day of his interview, when he questioned whether he could have a lawyer present and asserted that he did not previously understand this right.

At the same time, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). The totality of Cook's conduct, particularly on the first day of his interview, as well as his background and experience, support the conclusion that Cook fundamentally understood his Fifth Amendment rights. Cook had been arrested and been provided *Miranda* warnings on several occasions in the past, which the investigators confirmed at the beginning of the interview. And throughout much of the interview, Cook was able to respond coherently to the investigators' questions. Based on these factors, the government's alternative interpretation of the circumstances is reasonable: Cook "understood his rights and agreed to speak with police without counsel but then changed his mind the next day, proffering the self-serving

excuse that he had not earlier understood his right to counsel."[10]

Under AEDPA's deferential standard of review, we must keep in mind that review of Cook's habeas action is "not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03. In order to grant relief, we are required to find that no fairminded jurist could conclude that Cook knowingly and voluntarily waived his *Miranda* rights. Although there are certain facts in the record that may support a finding that Cook did not fully and completely understand his right to have an attorney present at his interrogation, we must give even greater deference under AEDPA when determining whether the case-specific application of a general standard, such as the "totality of the circumstances" test, provides a reasonable basis for a state court decision. Based on the facts that Cook was repeatedly warned of his *Miranda* rights, expressly acknowledged the warnings, and offered coherent and knowing answers to the officers' questions, the California Supreme Court had a reasonable basis to reject Cook's challenge to the validity of his *Miranda* waiver.[11]

---

[10] Given these circumstances, the dissent's assertion that we find "one-word verbal affirmations" sufficient to establish that Cook understood the rights he was waiving obviously mischaracterizes our decision. *See* Dissent at 48.

[11] The dissent arrives at a contrary conclusion after conducting what appears to be its "own independent inquiry into whether the state court was correct as a *de novo* matter" under the guise of AEDPA review. *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004). It is emphatically not the role of a federal habeas court to "issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Id.* (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002) (per curiam)).

B.

We next address the voluntariness of Cook's confession. An involuntary or coerced confession is inadmissible at trial, *Lego v. Twomey*, 404 U.S. 477, 478 (1972), because its admission is a violation of a defendant's right to due process under the Fourteenth Amendment, *Jackson v. Denno*, 378 U.S. 368, 385–86 (1964). A confession is involuntary if it is not "'the product of a rational intellect and a free will.'" *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (citation omitted). A "necessary predicate" to finding a confession involuntary is that it was produced through "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Coercive police activity can be the result of either "physical intimidation or psychological pressure." *Townsend v. Sain*, 372 U.S. 293, 307 (1963). Whether a confession is involuntary must be analyzed within the "totality of [the] circumstances." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). "The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) (citations omitted).

Cook argues that the evidence in the existing record establishes coercion, highlighting the expert opinions that his statements to police were not voluntary based on his mental capabilities at the time. Cook likens his situation to *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc), where we held that the 38-minute noncustodial interview of an eighteen-year old with an IQ of 65 was coercive and rendered his confession involuntary. Cook's IQ at the time of his interview ranged between 83 to 89, which is notably higher than Preston's. However, other

aspects of Cook's interrogation are comparable to Preston's, such as their similar age and some of the descriptions of their mental attributes—i.e., "easily confused" and "highly suggestible and easy to manipulate." *Id.* at 1022. Cook's investigators also employed some of the same interrogation techniques that we noted "would be hard for a person of Preston's impaired intelligence to withstand or rationally evaluate"—such as "alternative questioning, providing suggestive details, and repetitious and insistent questions." *Id.* at 1025–26. Moreover, Cook's custodial interrogation also lasted around seven hours—far longer than the noncustodial interview in *Preston*—during which Cook became emotional at times and appeared physically exhausted by the end. These factors, on de novo review, could support the same conclusion we reached in *Preston*: that the "subtle forms of psychological persuasion" employed by the investigators were sufficiently coercive to overcome Cook's will. *See id.* at 1023 (quoting *Connelly*, 479 U.S. at 164).

However, our opinion in *Preston* is not "clearly established" Supreme Court precedent and thus not controlling under AEDPA review. *See Williams*, 529 U.S. at 412 (stating that the phrase "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision"). Moreover, none of the Supreme Court cases cited by Cook provide us with a "materially indistinguishable" set of facts by which we can determine whether the state court's decision to deny relief in Cook's case ran contrary to clearly established federal law. *See id.* at 405. Nor do we find that the state court's conclusion would be an unreasonable application of clearly established federal law to the facts of Cook's case. Indeed, the "totality of the circumstances" test for voluntariness as

established by the Supreme Court is a fact-based analysis that inherently allows for a wide range of reasonable application. Since "[a]pplying a general standard to a specific case can demand a substantial element of judgment," federal courts must provide even "more leeway" under AEDPA in "evaluating whether a rule application was unreasonable . . . in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *see also Richter*, 562 U.S. at 101 (applying this greater degree of deference in a case where the state court denied habeas relief in a one-sentence summary order).

Given this, Cook utterly fails to show how the conclusion that his confession was voluntary under the totality of the circumstances is "inconsistent with the holding in a prior decision of the Supreme Court." *Richter*, 562 U.S. at 102. Cook's case presents several circumstances that, taken together, could reasonably support the finding that his confession was voluntary. First, there is the apparent lack of blatantly coercive police activity from the videotaped interview. Aside from some of the suggestive or "repetitious and insistent" questioning we earlier noted, the entire interview contains little indication of coercion. In fact, the investigators' interactions with Cook throughout the interview appear professional, calm, and even affable at times. They did not raise their voices or threaten Cook or make explicit promises of leniency for his confession, and they offered him breaks, food, and water throughout the interview. Second, Cook's responses, taken as a whole, could be reasonably viewed as a deliberate—and largely successful—effort on his part to resist the officers' interrogation tactics. Throughout the interview, Cook manages to evade the officers' repeated and varied attempts to elicit specific admissions and inculpating details about the crimes, often by providing non-responsive, diversionary

answers to their questions. When he does finally "confess," he makes only vague admissions to facts that minimize his culpability for the crimes—for instance, his repeated claims that he "blanked" out and does not remember actually committing the murders. Third, the circumstances surrounding the crimes and Cook's personal history—such as his disposal of the murder weapon and flight to Oklahoma after the Morris shooting, as well as his previous arrests and experience with law enforcement—suggest that he could appreciate the gravity of his situation and his actions and could take affirmative measures to minimize or mask his guilt.

In light of the state court record, the California Supreme Court had a reasonable basis to conclude that Cook's confession was voluntary.

## C.

We finally address Cook's request for an evidentiary hearing into his allegation that Sergeant Eatmon threatened him at gunpoint during his interview. As evidentiary support for his factual claim, Cook cites to the videotaped confession, in which he claims he makes indirect references to Eatmon's gunpoint threat,[12] and to his proffered evidence "that Eatmon had a reputation for sadistic violence, and a documented history of lying and lacking integrity." Although Cook presented this evidence along with a request for an evidentiary hearing in his state habeas petition, the California Supreme Court summarily denied his petition

---

[12] Specifically, Cook points out that, minutes after Eatmon allegedly threatened him and the interrogation resumed, he states, "[E]veryone know that I did it or not, I did it so, you all can just shoot me or whatever it don't matter."

without granting a hearing on this issue.  According to Cook, because the state court never afforded him an evidentiary hearing to develop his claim, its fact-finding process was deficient, and this court should review Cook's claims de novo.  Alternatively, Cook asks us to "remand to the district court for an evidentiary hearing on the allegation against Eatmon."  Cook's arguments essentially raise two separate claims: (1) the state habeas court's failure to make any factual findings regarding the alleged gunpoint threat by Sergeant Eatmon was, in itself, an "unreasonable determination of the facts" under § 2254(d)(2), and (2) Cook is otherwise entitled to a federal evidentiary hearing under § 2254(e)(2).

To determine whether a petitioner is entitled to an evidentiary hearing under § 2254(e)(2), a court must first determine whether a factual basis exists in the record to support the petitioner's claim.  *Insyxiengmay v. Morgan*, 403 F.3d 657, 669–70 (9th Cir. 2005) (quoting *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999)).  If the record contains a sufficient factual basis that "refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Landrigan*, 550 U.S. at 474; *see Pinholster*, 563 U.S. at 171 ("[A] federal habeas court is 'not required to hold an evidentiary hearing' when the state-court record 'precludes habeas relief' under § 2254(d)'s limitations.") (citation omitted).  If the factual basis for a claim is undeveloped or absent, the next inquiry is whether petitioner "failed to develop" these facts in state court proceedings. *Insyxiengmay*, 403 F.3d at 669–70.  Only when a petitioner demonstrates that he did not fail to develop the factual basis for his claim in state court may a federal court proceed to consider whether a hearing is appropriate or required under the framework set forth in *Townsend v. Sain*.  *Id*.

Under this analytical framework, Cook is not entitled to an evidentiary hearing. Cook's failure to develop the factual basis for his claim in state court proceedings was due to his own lack of diligence. "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432; s*ee Baja*, 187 F.3d at 1078. The standard for determining "diligence" is whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. Absent unusual circumstances, diligence requires "that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. However, "a petitioner who 'knew of the existence of [] information' at the time of his state court proceedings, but did not present it until federal habeas proceedings, 'failed to develop the factual basis for his claim diligently.'" *Rhoades v. Henry*, 598 F.3d 511, 517 (9th Cir. 2010) (quoting *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005)).

Cook claims he was diligent simply because he requested an evidentiary hearing in his 2005 habeas petition to the California Supreme Court but was denied. However, Sergeant Eatmon allegedly threatened Cook during his interrogation in 1992, which was nearly two years prior to his trial. Thus, Cook was aware of the facts underlying this claim both prior to trial and long before he first raised it in his habeas petition. Cook does not explain whether he informed his counsel about this incident, or why this factual allegation was not raised at trial or on appeal, except in the context of his claim that his trial counsel was ineffective. Cook's counsel did not cross-examine Sergeant Eatmon on

this alleged threat, nor do they mention the incident in either the motion to suppress the confession at trial, or in their 2005 state habeas affidavits—all of which suggests that Cook's counsel were unaware of Sergeant Eatmon's alleged threat during the interview because Cook never informed them. Cook does not assert otherwise, nor does he proffer any reason for why he should be absolved of his personal responsibility for the diligent pursuit of his claims. Under § 2254(e)(2), we may not grant Cook an evidentiary hearing—almost three decades after trial in federal habeas court—to develop the factual basis of a claim that Cook knew of before trial and failed to develop during his state proceedings.

For similar reasons, we also reject Cook's claim that the state habeas court's denial of an evidentiary hearing into his Sergeant Eatmon allegation was, in itself, an "unreasonable determination of the facts" under § 2254(d)(2). We view Cook's argument here as essentially an "intrinsic" challenge to the state court's determination of fact under § 2254(d)(2), which "may be based on a claim . . . 'that no finding was made by the state court at all,' when it was required to make a finding." *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004)). When performing an intrinsic review, we "may only hold that a state court's factfinding process is materially defective if we are 'satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Id.* (quoting *Taylor*, 366 F.3d at 1000). Cook fails to overcome this standard because he does not show how the state court was required to afford him an evidentiary hearing to develop a factual allegation of which he was aware, but did not raise, at trial. In short, Cook is not entitled

to an evidentiary hearing under AEDPA, and the district court did abuse its discretion in denying his request.

## IV.

We affirm the district court's denial of relief on Cook's claim that his confession was obtained in violation of his constitutional rights. Based on the record, the state habeas court had a reasonable basis for finding that Cook's waiver was knowing and intelligent, and that his confession was not coerced and involuntary. In addition, Cook is not entitled to an evidentiary hearing on the issue of the voluntariness of his confession because he failed to timely develop in state court the factual basis for his claim that Sergeant Eatmon threatened him at gunpoint. The district court's denial of Cook's habeas petition is **AFFIRMED**.

CALLAHAN, Circuit Judge, concurring:

Because the state court could have reasonably denied Cook's claim on the ground that his *Miranda* waiver was valid and his statements to police were voluntarily given, we are compelled to deny relief under AEDPA and need not reach the question of whether Cook was prejudiced by the admission of his statements. But if we did, I would agree with the district court that the California Supreme Court could have reasonably denied Cook's claim on the ground that any error was harmless.

"For reasons of finality, comity, and federalism, habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197, 192 L. Ed. 2d 323 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993)).  In testing for prejudice under AEDPA's deferential standard of review, "relief is proper only if" we have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  This standard "reflects the view that a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'" *Id.* at 2198 (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)).  Thus, to warrant relief under AEDPA, Cook must show that he was actually prejudiced by the admission of his statements at trial—"a standard that he necessarily cannot satisfy if a fairminded jurist could agree with the California Supreme Court's decision that [the error was harmless]." *Id.* at 2199.

Given the totality of the record evidence, Cook is unable to establish that his statements regarding the murders of Bettencourt and Morris, if erroneously admitted, had "substantial and injurious effect" on the jury's findings of guilt as to those murders. *Brecht*, 507 U.S. at 637.  As the dissent points out, a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citing *Bruton v. United States*, 391 U.S. 123, 139–40 (1968) (White, J., dissenting)).  In Cook's case however, the equivocal statements he made in confessing to the Bettencourt and Morris murders are not particularly damning admissions of guilt.  Even after seven hours of questioning, Cook provided little detail as to why or how he committed the murders, offering only vague accounts that he was at each of the crime scenes with a weapon in hand and "blanked out."  If anything, Cook's admissions in his taped

interview provided evidence that mitigated his mental culpability for the crimes, which his defense team reasonably viewed as helpful to his case.

Moreover, both the Bettencourt and Morris murders were supported by several different sources of evidence—including the corroborating testimonies of multiple witnesses and forensic evidence—all of which consistently demonstrated that Cook's shootings of these victims amounted to similar instances of unprovoked, cold-blooded murder. The Bettencourt murder was witnessed by a large group of individuals at the scene, and seven witnesses gave statements to police that identified Cook as the shooter. Likewise, the Morris murder was witnessed by the two other inhabitants in Cook's car, as well as the women in the car behind them.

The dissent claims that most of this evidence was "either seriously compromised or inconclusive" based on witness recantations at trial, bias and motives to fabricate, and some inconsistencies in the evidence.[1]  However, even without the

---

[1] The dissent also argues that the admission of Cook's confession was prejudicial because it led to the trial court's improper joinder of his three murder charges, even though Cook himself does not raise this argument in his habeas petition. In reviewing a state court's summary denial of a habeas claim under AEDPA, our task is to determine "what arguments or theories . . . could have supported[] the state court's decision," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), *not* to search for any arguments or theories that could have supported an opposite conclusion and grant of relief. Even if we were to consider the question of prejudice through the lens of an improper joinder claim, the California Supreme Court reasonably found on direct appeal that the trial court's joinder of the charges was proper, and did so by relying on evidence that was independent of Cook's confession—*i.e.*, the "substantial cross-admissibility" of the ballistics evidence between the Bettencourt and

eyewitness accounts that were allegedly "compromised" by bias or recantation, the record contains evidence from unbiased sources sufficient to support the jury's verdicts for the two murders. For instance, in regard to the Morris murder, Sharoon Reed—a neutral bystander eyewitness with no apparent bias or motive to fabricate—provided an account that corroborated the testimony of Senegal and Branner. Similarly, Nathan Gardner, a bystander who happened to be on Alberni Street when he saw Cook shoot Bettencourt, gave Cook a ride from the murder scene and testified that Cook explained that he shot Bettencourt because Bettencourt had tried to "gaffle" him. Perhaps more importantly, Cook's various challenges to the witnesses' credibility and other evidence were fully presented to and weighed by the jury at trial. Ultimately, they do not undermine the highly probative facts that multiple witnesses—from different vantage points at each of the crime scenes and with different relationships to Cook—provided generally consistent accounts, which, along with the ballistics evidence, clearly implicated Cook.

In light of the weight of the evidence in the record, the state habeas court could have reasonably denied Cook's claim on the basis that the admission of his confession did not prejudice him at trial. Because Cook is unable to show actual prejudice or that no fairminded jurist could agree with the California Supreme Court's rejection of his claim on the basis of harmlessness, he is not entitled to relief under AEDPA.

---

Morris murders, and the common eyewitness between the Morris and Sadler murders. *See People v. Cook*, 139 P.3d 492, 505 (Cal. 2006).

MURGUIA, Circuit Judge, dissenting:

I respectfully disagree with the majority's conclusion that the California Supreme Court could have reasonably denied habeas relief on the basis that Cook (1) knowingly and intelligently waived his *Miranda* rights; and (2) suffered no prejudice from the improper admission of his unlawfully obtained confession to the Bettencourt murder and other incriminating statements.  Accordingly, I would reverse the district court's denial of habeas relief.

## 1.  Standard of Review.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a writ of habeas corpus may not be granted unless the state court's decision (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *id.* § 2254(d)(2).

"The state court unreasonably applies clearly established federal law if it 'either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.'" *DeWeaver v. Runnels*, 556 F.3d 995, 997 (9th Cir. 2009) (quoting *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir. 2002), and then citing *Williams v. Taylor*, 529 U.S. 362, 408–09 (2000)); *see also Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016) (en banc).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Metrish v. Lancaster*, 569 U.S. 351, 358 (2013).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Davis v. Ayala*, 135 S. Ct. 2187, 2199–2200 (2015) ("State-court factual findings, . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006))). "Even in the context of federal habeas, …[d]eference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. at 340.

Here, the California Supreme Court "denied on the merits" all of Cook's habeas claims—including that he did not knowingly and intelligently waive his *Miranda* rights— in a summary order, unaccompanied by an opinion explaining the reasons relief was denied. "Section 2254(d) applies even where there has been a summary denial." *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citing *Richter*, 562 U.S. at 98). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's

burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Therefore, when the state court summarily denies a petitioner habeas relief, "[u]nder § 2254(d), a habeas court must determine what arguments or theories . . . *could have* supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102 (emphasis added); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) ("Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims,' and to give appropriate deference to that decision" (quoting *Hittson v. Chatman*, 135 S.Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari) and then citing *Richter*, 562 U.S. at 101–102)); *Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding that where a state habeas court issues an opinion that addresses some issues but does not expressly address the federal habeas claim in question, that claim "must be presumed to have been adjudicated on the merits by the [state habeas court] . . . [and] the restrictive standard of review set out in § 2254(d)(2) applies").

If we conclude that the state habeas court committed a constitutional error during a criminal trial, we "must [then] assess the prejudicial impact of the error under the 'substantial and injurious effect' standard set forth in *Brecht v. Abrahamson*." *Fry v. Pliler*, 551 U.S. 112, 114 (2007) (quoting 507 U.S. 619 (1993)); s*ee also Jones v. Harrington*, 829 F.3d 1128, 1141 (9th Cir. 2016) ("In AEDPA proceedings, [the court] appl[ies] the actual-prejudice

standard set forth [*Brecht*].").  "There must be more than a 'reasonable possibility' that the error was harmful."  *Ayala*, 135 S. Ct. at 2198 (quoting *Brecht*, 507 U.S. at 637).  "[A] 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'"  *Id.* (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)).

> **2. The state habeas court's summary conclusion that Cook knowingly and intelligently waived his *Miranda* rights was an unreasonable application of *Thompkins* and its progeny and relied on an unreasonable determination of the facts.**

The state habeas court's summary order finding that Cook knowingly and intelligently waived his *Miranda* rights is an unreasonable application of *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010), which is clearly established federal law, and relies on an unreasonable determination of the facts.  Therefore, the admission of Cook's confession to the Bettencourt murder and other incriminating statements about the Morris murder constitutes an unconstitutional trial error under AEDPA.

I would affirm the district court's well-supported finding that Cook's *Miranda* waiver was not knowing and intelligent under *Thompkins*, "[g]iven substantial evidence of his inability to comprehend his rights, including his youth, low IQ, psychological deficiencies, inability to follow verbal instructions, dissociation, and his statements to interrogators that he did not understand he had the right to have a lawyer present at his interrogation[.]"

The Supreme Court has clearly established that a *Miranda* waiver must be done knowingly and intelligently. *Thompkins*, 560 U.S. at 383 (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)). There is a well-established presumption against waiver, *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (quoting *Miranda*, 384 U.S. 436, 475 (1966)), and the government bears the burden of overcoming that presumption by introducing sufficient evidence that, under the totality of the circumstances, Cook was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Thompkins*, 560 U.S. at 384 (clarifying "that this 'heavy burden' is . . . the burden to establish waiver by a preponderance of the evidence" (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986))). The government's burden to make such a showing "is great," and we "must indulge every reasonable presumption against waiver of fundamental constitutional rights." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir.1984) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

There is no objectively reasonable basis for the California Supreme Court's holding that Cook, an intellectually disabled man with severe mental illnesses, was competent to fully understand and waive his *Miranda* rights. Although the Supreme Court has never directly addressed whether intellectually disabled and mentally ill defendants can knowingly and intelligently waive their Fifth Amendment rights, it would be unreasonable not to apply the principles of *Thompkins* and its progeny to award habeas relief in this case. *See Williams*, 529 U.S. at 407 (holding that a state-court decision can be overturned by the federal courts if the state "unreasonably refuses to extend [a] principle to a new context where it should apply"); *cf.*

*Bradley v. Duncan*, 315 F.3d 1091, 1100–01 (9th Cir. 2002) (holding that state court's refusal to allow petitioner to put on entrapment defense constituted unreasonable application of federal law as it violated his "right to present a complete and meaningful defense to the jury under the principles set out in [Supreme Court cases]").

The majority advances what are the only four possible reasons that could have supported the California Supreme Court's decision to summarily deny Cook's claim that he did not knowingly and intelligently waive his *Miranda* rights. First, my colleagues state that Cook fully understood he was waiving his *Miranda* rights because, at the outset of the June 26, 1992 interrogation, he "readily affirmed that he understood his rights and wanted to speak anyway." Op. at 25. Second, they reason that "throughout much of the [June 26 interrogation], Cook was able to respond coherently to the investigator's questions." Op. at 26. Third, they submit that he "changed his mind the next day, proffering the self-serving excuse that he had not earlier understood his right to counsel." Op. at 26–27. Finally, the majority relies significantly on the fact that Cook had been arrested and presumably read his *Miranda* rights in the past. Op. at 26. None of these reasons "could have led a fairminded jurist to conclude that" Cook knowingly and intelligently waived his constitutional rights pursuant to *Thompkins* and its progeny. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (citing *Richter*, 562 U.S. at 102). In turn, I will address each of the majority's misguided reasons for denying habeas relief.

First, I disagree with the majority's unsupported holding that one-word verbal affirmations are sufficient, considering the totality of other circumstances involved here, to establish that a man with Cook's acute intellectual disability and

mental illnesses had a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Thompkins*, 560 U.S. at 382–83 (quoting *Burbine*, 475 U.S. at 421).

It is undisputed that Cook verbally responded "yeah" and "uh-hum" when asked if he understood his *Miranda* rights at the outset of the June 26 seven-hour interrogation, during which he confessed to the Bettencourt murder and made other incriminating statements about the Morris murder. At best, this "establishes that a *Miranda* warning was given and the accused made an uncoerced statement," which "standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights." *Thompkins*, 560 U.S. at 384 (quoting *Miranda*, 384 U.S. at 475). "The prosecution must make the additional showing that the accused understood these rights." *Id.* (citations omitted). Here, there is overwhelming evidence that Cook did *not* understand his rights due to his serious intellectual disability and mental illnesses. In fact, at the direction of the California Supreme Court, the trial court found that Cook was intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002), vacating his death penalty and imposing a sentence of life without the possibility of parole.[1] Although not determinative, the state trial court's finding that Cook was intellectually disabled under *Atkins* creates a strong presumption that Cook was unable to understand his *Miranda* rights, and thus unable to knowingly and intelligently waive them. *See United States*

---

[1] The Supreme Court explicitly reasoned in *Atkins* that intellectually disabled defendants are ineligible for the death penalty, in large part, because they are very susceptible to offering false confessions. *See* 536 U.S. at 320 (citing Everington & Fulero, *Competence to Confess: Measuring Understanding and Suggestibility of Defendants with Mental Retardation*, 37 Mental Retardation 212, 212–213, 535 (1999)).

*v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998) (holding that defendant could not have knowingly and intelligently waived his *Miranda* rights because his "IQ is borderline retarded" and he was unable "to understand oral instructions").

In order to reach the opposite outcome, the state habeas court and the majority completely—and erroneously—overlook the uncontroverted expert testimony of Dr. Woods and Dr. Wilkinson that Cook is "dependent upon cues and guidance from others to maintain a useful and functional organization of information", "readily incorporates cues, prompting and direction from others," and is vulnerable to "suggestibility and confabulation." This uncontradicted expert testimony conclusively establishes that Cook was unable to understand his constitutional rights, even if he made statements to the contrary.

The state trial court's determination that Cook is intellectually disabled was also supported by an overwhelming wealth of expert testimony that expanded on the depth and severity of Cook's intellectual disability. Before trial, Doctor William Lynch, a neuropsychologist, testified that Cook's "verbal and performance abilities fall[] at the extreme low-end of the Average range," that he suffers from a developmental learning disability involving reading and writing, and that he had a "narrow, precarious attention span that can be interrupted easily." As a result, Cook "often fails to apprehend complete messages (words, phrases or numbers)" and "is apt to have difficulty with understanding complex spoken and written speech." Doctor Myla Young, a clinical psychologist, also testified that Cook's mental function was "Borderline to Low Average" and that, even though his general IQ was a very low 83, his performance on the part of the test that measures his ability to process new

information resulted in a below-average IQ of 78. Accordingly, Dr. Young concluded that Cook had a cognitive "level of performance . . . similar to that demonstrated by most children with an age equivalence of 9.9 years old." Similarly, Dr. George Wilkinson, who evaluated Cook, concluded that Cook "had life-long attentional and learning disabilities that reduced his performance even below his measured intelligence level of borderline to below average." In other words, all these experts agreed that Cook is intellectually disabled to such a degree that it was impossible for him to understand his constitutional rights, let alone waive them.

Mental health experts who evaluated Cook also testified that, in addition to his low IQ, Cook suffers from grave mental illnesses that prevented him from understanding the rights he was giving up. Doctor George Woods, a psychiatrist, diagnosed Cook with an organic brain disorder that causes him to dissociate and to fail to recall information and details. He also diagnosed Cook with post-traumatic stress disorder ("PTSD") and depression. According to Dr. Woods, Cook "readily incorporates cues, prompting and direction from others" and is vulnerable to "suggestibility and confabulation." Therefore, Dr. Woods concluded that Cook satisfies the diagnostic criteria for "mental retardation" if you couple these mental illnesses with his borderline intellectual functioning. Given Cook's cognitive and mental disabilities, Doctor Zakee Matthews, a clinical psychiatrist who reviewed the video recording of Cook's interrogation, also opined that "it was extremely unlikely Mr. Cook could have meaningfully understood the admonition regarding his legal rights as expressed in the language and manner used by the interrogating officers."

The government never offered expert testimony to contradict the opinions of the mental health experts who unanimously testified that Cook's intellectual disabilities and severe mental illnesses prevented him from understanding the rights he was giving up. *See Garibay*, 143 F.3d at 538 (finding no valid *Miranda* waiver because "[t]he government presented no evidence to contradict the fact that [the defendant] . . . is borderline retarded with extremely low verbal-English comprehension skills"). Therefore, there is no expert evidence in the record to support the state habeas court's summary denial or the majority's holding, which rely on the disproven assumption that Cook was intellectually competent to knowingly and intelligently waive his rights. *See United States v. Glover*, 596 F.2d 857, 865 (9th Cir. 1979) (upholding *Miranda* waiver because the court properly relied on the prosecution's expert's testimony "that [the defendant] was competent to waive his rights if they were explained to him in simple language").

In light of Cook's significant intellectual disabilities and mental illnesses, the majority's contention that Cook's one-word affirmations at the outset of the June 26 interrogation were enough for the California Supreme Court to deny habeas relief defies common sense and federal law clearly established by the Supreme Court in *Thompkins* and its progeny. Rather, any fairminded jurist faithfully applying those controlling precedents in this case would conclude that Cook was so intellectually disabled and mentally ill that he was unable to knowingly and intelligently waive his constitutional rights.

Second, the majority's contention that Cook provided coherent answers to the investigators' questions during the June 26, 1992 interrogation is an unreasonable

determination of the facts. To the contrary, the transcript and videotape of the interrogation show that Cook is obviously confused and distressed, and his responses are unfocused and hard to follow. At the outset of the interrogation, for example, Cook stated that his birthday was September 25, 1971 (which would have made him twenty years old) and that he was nineteen years old. When Inspector Sabin explained the contradiction between his answers, Cook responded with ". . . that's what, what my mother told me, so." But, Cook stated, he "knew for a fact" he was going to be "twenty this year." He was wrong about his birthday and his age. Cook also did not know addresses of where he had lived for the past five or six months; gave multiple contradictory statements about dates and durations; did not know the day of the week or what month it was; and failed to remember how he got to Oklahoma. All this occurred within the first couple of minutes of the June 26 interrogation. The district court therefore correctly interpreted this colloquy—the first set of questions after Cook was *Mirandized*—as one of the first "signs that Cook was either seriously confused, or otherwise mentally incompetent."

Later in the interrogation, at round 9:34 p.m., in response to lengthy and suggestive questions by Inspector Sabin about what Morris said or did to trigger the shooting, Cook began to cry, stating, "No, I never do nothing to nobody, I try to be everybody friend. I can't work 'cause I live on another part [of town]." As Inspector Sabin persisted with questions about the Morris shooting, Cook continued to cry uncontrollably and to reiterate incessantly that he was afraid to endanger his family.[2] It is in this highly rambling and

---

[2] Cook made increasingly paranoid statements about his family being in danger: "I'm in for it regardless if I say something or not, if I,

distressed mental state that Cook made the incriminating admissions that he was in the car with Branner and Senegal the night of the Morris murder, had a gun with him, and "blanked out" after Morris approached the vehicle. No reasonable jurist could read this transcript or view this videotape and conclude that Cook was responding "coherently."

Cook's distress and confusion got worse. At around 11:13 p.m., Cook was sobbing loudly when he disclosed that his father used to beat his mother in response to Inspector Sabin's question about why he went to see a therapist when he was younger. From this point, Cook became increasingly emotional and incoherent. Sabin and Eatmon offered him a drink, which he declined, and unsuccessfully tried to loop back to questioning about Morris. While still crying uncontrollably, Cook continued to talk about his abusive childhood while making distressed and nonsensical statements, such as: "I don't care, they can kill me, do whatever they want, I don't care no more,"; "I hope they kill me or whatever, I don't want to worry about waking up every night, just thinking about got to help my mother, and I can't do nothing to stop it . . . let them kill me, I don't care, I have nothing to live for, nobody even care about me anyway so, I mean, it's better if I'm gone"; and "I don't care what happens to me, kill me, I'd be more of a big heavy burden." At

---

if I tell you something, then put my family life in danger, I'd rather something just happen to me;" "It shouldn't really matter, whatever I say now, you said I'm guilty, you got, you got all this stuff that I'm in it, so . . . regardless of what I say, you know what I'm saying, it's not going to happen, you know what I'm saying, if you all plan on killing me or whatever . . . well, I'm doing electric chair or 25 to life . . . it's, it just don't matter now;" "And then, after I tell you all the truth, whatever it is, who, you know what I'm saying, I got to face the consequences of what happened to, what if somebody kill my father and them."

around 11:38 p.m., the investigators decided to take a break for Cook to calm down and escorted Cook back to his cell. When the taped interview resumed at around 12:10 a.m., Inspector Sabin reminded Cook of his *Miranda* rights and then began questioning him about the Bettencourt murder. But the break did not work, because Cook quickly became very distressed, confused, and incoherent. This is when Cook abruptly confessed to the Bettencourt murder. Cook's distress and confusion during the lengthy interrogation escalated to the point that by the end he was violently coughing and vomiting.

The mental health experts who evaluated Cook confirmed that Cook was confused, distressed, and incoherent during the June 26 interrogation. Coupled with Cook's intellectual disability and mental illnesses, these experts unanimously concluded that it was impossible for him to understand his *Miranda* rights, let alone to knowingly and intelligently waive them. "[B]ased on signs of Mr. Cook's impaired cognition, distractibility[,] and dissociative tendencies during clinical assessments, and similar signs appearing in the videotape," Dr. Matthews testified that "it is evident that [Cook's] limited abilities to attend to or comprehend minimally complex language were overwhelmed during the commencement of the interview." Dr. Wilkinson agreed that "the circumstances of the interrogation, including Mr. Cook's neuropsychological and intellectual impairments and the effects of his trauma-based symptoms, prevented him from knowingly and intelligently understanding and waiving his right to remain silent."

Therefore, the majority's contention that Cook was "coherent" throughout most of the June 26 interrogation is simply unfounded. Such an unreasonable determination of the facts in the record could not justify the California

Supreme Court's denial of relief here. Rather, a fairminded jurist reviewing the transcript and videotape of the interrogation—and the expert evaluation of those materials—would find that Cook was distressed, confused, and incoherent throughout most of the interview, especially when he confessed to the Bettencourt murder and made other incriminating statements about the Morris murder.

Third, the majority argues that the California Supreme Court could have reasonably found that Cook conveniently pretended that he did not understand his rights the day after the June 26 interrogation as "a self-serving excuse" to backtrack his prior waiver. Op. at 26–27. This conclusion is also an unreasonable determination of the facts under AEDPA.

The day *after* his June 26 interrogation—during which he confessed and made other incriminating statements— Cook explicitly stated that he did not understand his *Miranda* rights, including the right to have an attorney present during questioning. When the investigators again read his rights before the second interview, Cook asked, "when you all talk to me, I'm supposed to have an attorney here or something?" The officers clarified that he had the *right* to have an attorney present. This led to the following exchange:

> Cook: Is that the only time you could have an attorney to be able, when you go to court?
>
> Inspector Sabin: You can have an attorney present any time during these [] proceedings.
>
> Cook: I didn't know that.

> Inspector Sabin: Okay, well, do you remember me reading that off to you yesterday?
>
> Cook: Not really, but I remember you was reading something about my rights.

At this juncture, Cook asked to speak with his mother and refused to continue talking until he had done so. Inspector Sabin then asked him a series of questions trying to surmise what Cook had understood to be his *Miranda* rights when he appeared to waive them the day before. Cook reiterated that he "didn't know that . . . when you guys talked to me that I could have a lawyer here." Cook then proceeded to meet privately with his mother, after which he refused to continue speaking to the investigators until he had a chance to talk to a lawyer.

The only objectively reasonable interpretation of this exchange—given his intellectual disability and mental illnesses—is that Cook did not understand his *Miranda* rights until he had a chance to talk to his mother, well after he confessed to the Bettencourt murder and made other incriminating statements the night before. The majority's skepticism of Cook's motives in asking these questions is unreasonable, especially considering the undisputed evidence that he was intellectually disabled and suffered from grave mental illnesses. If anything, no fairminded jurist would disagree that these questions are further evidence that Cook did not truly understand his constitutional rights the night before.

Finally, the majority proclaims that Cook understood his *Miranda* rights because he "[he] has been arrested and provided *Miranda* waivers on several occasions in the past."

Op. at 26.  But the record clearly supports a finding that Cook did not understand his *Miranda* rights at the time of his previous arrests, either.  As an initial matter, those arrests occurred when he was a minor.  More importantly, when Inspector Sabin asked him if he had read and understood his *Miranda* rights when he was arrested in the past, Cook explained that "[he] didn't know . . . when [] people come to question you, you can have a lawyer present with you."  Therefore, these past experiences "do not indicate that [Cook] was familiar with his *Miranda* rights and his option to waive those rights" based on his prior experiences with law enforcement.  *Garibay*, 143 F.3d at 539 (citing *Cooper v. Griffin*, 455 F.3d 1142. 1144–45 (5th Cir. 1972)).  The majority's contention otherwise is an unreasonable determination of the facts and thus cannot justify the California Supreme Court's denial of habeas relief.

In sum, under AEDPA, it was both "an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States" in *Thompkins* and its progeny, and "an unreasonable determination of the facts," for the state habeas court to summarily conclude that Cook's *Miranda* waiver was knowing and intelligent despite the overwhelming evidence to the contrary.  28 U.S.C. §§ 2254(d)(1), (d)(2).  Indeed, "there was no reasonable basis for the state court to deny relief," or for the majority to conclude—contrary to uncontroverted expert testimony—that a defendant who is intellectually disabled and suffers from serious mental illnesses, is interrogated for seven hours, and shows visible physical signs of extreme distress and confusion, knowingly and intelligently waived his

*Miranda* rights. *Richter*, 562 U.S. at 98. No reasonable fairminded jurist would conclude otherwise.[3] *Id.* at 103.

### 3. The admission of Cook's unlawfully obtained confession and other incriminating statements was harmful.

The conclusion that no reasonable jurist would have found Cook's *Miranda* waiver valid does not end our inquiry. Cook is "not entitled to habeas relief based on trial error unless [he] can establish that it resulted in actual prejudice." *Ayala*, 135 S. Ct. at 2197 (2015) (quoting *Brecht*, 507 U.S. at 637). The California Supreme Court's summary order denying habeas relief also failed to explicitly address whether Cook was prejudiced by the improper admission of his unlawfully obtained confession to the Bettencourt murder and other incriminating statements about the Morris murder. Nonetheless, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

A "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. 279, 296 (1991) (citing *Bruton v. United States*, 391 U.S. 123, 139–40 (1968) (White, J., dissenting)). "Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Id.* Therefore, in order to deny Cook's claim

---

[3] Because Cook's *Miranda* waiver was not done knowingly and intelligently, we do not need to reach the issue of whether his confession was involuntary or coerced.

on the basis that there was no prejudice, the California Supreme Court "must be able to declare" that the admission of Cook's confession and other incriminating statements "was harmless beyond a reasonable doubt." *Id.* at 295 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). In other words, "[t]he prejudice from [a defendant's] confession cannot be soft pedaled." *Anderson v. Terhune*, 16 F.3d 781, 792 (9th Cir. 2008) (en banc).

Here, the unconstitutional admission of Cook's confession to the Bettencourt murder and other incriminating statements at trial was harmful in two distinct ways: (1) the trial court relied on these admissions to impermissibly hold a single joint trial for the unrelated murders of Sadler, Bettencourt, and Morris, in violation of Cook's due process rights; and (2) the confession was central to his conviction because the other evidence against him was inconsistent and highly compromised. Therefore, I "think that the [admission of Cook's unlawfully obtained confession to the Bettencourt murder and other incriminating statements about the Morris murder] substantially influenced the jury's decision" and I have no doubt that it had an injurious effect on the jury's verdict. *O'Neal*, 513 U.S. at 436; *see also Poyson v. Ryan*, 879 F.3d 875, 891–92 (9th Cir.) (as amended), *cert. denied*, 138 S. Ct. 2652 (2018).

> ### a. The admission of Cook's confession and other incriminating statements resulted in the harmful consolidation of the three unrelated murders into a single trial.

The unconstitutional admission of Cook's unlawfully obtained confession to the Bettencourt murder and other incriminating statements led the trial court to impermissibly consolidate the three unrelated murders of Bettencourt,

Morris, and Sadler into a single trial, which "resulted in prejudice so great as to deny [Cook] of his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, n. 8 (1986); *see also Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998) ("The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate" (quoting *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991)); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) (modifications in original) (holding that there is a prejudicial constitutional violation where the "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." (quoting *Sandoval v. Calderon*, 241 F.3d 765, 771–72 (9th Cir. 2001)).

Cook's joint trial for the three unrelated murders of Bettencourt, Morris, and Sadler was highly prejudicial because it allowed evidence admissible as to only one of the murder charges to impermissibly "spillover" to the other murder charges. "We have recognized that the risk of undue prejudice is particularly great whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible." *See Sandoval*, 241 F.3d at 772 (citing *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir.1986)); *Davis*, 384 F.3d at 638–39 (finding no prejudice to the defendant when evidence was cross-admissible); *Fields v. Woodford*, 309 F.3d 1095, 1109–10 (9th Cir. 2002) (same); *United States v. Johnson*, 820 F.2d 1065, 1070–71 (9th Cir. 1987) (same). For example, of the fifteen witnesses who testified at trial, only two—Shawnte Early and Shannon Senegal—allegedly witnessed more than one of the murders, and none of them allegedly witnessed all three murders. *People v.*

*Cook*, 139 P.3d 492, 502 (Cal. 2006). Similarly, the ballistics evidence for the Bettencourt and Morris murders was introduced together, even though the San Mateo Sheriff's Department was unable to confirm that the casings and bullets recovered from both crime scenes originated from the same weapon. *Id.* at 502. Most importantly, Cook's highly prejudicial and unlawfully obtained confession, and other incriminating statements, were introduced at the joint trial for all three murders, even though they only pertained to the Bettencourt and Morris murders, respectively. None of these statements had anything to do with the Sadler murder.

On direct appeal, the California Supreme Court nonetheless affirmed the trial court's finding that "substantial cross-admissibility" of evidence existed between the Bettencourt and Morris murders because "those victims were killed by multiple shots fired from the *same* gun, which [D]efendant *admitted was his*." *Id.* at 505 (emphases added). But, as discussed above, a San Mateo County Sheriff's criminalist testified that it was impossible to link the casings recovered from the Morris and Bettencourt murders to the same gun, especially because no gun was ever recovered. Op. at 8. *Cook*, 139 P.3d at 502. Therefore, in order to link the gun to both murders, the prosecution had to rely on Cook's incriminating statements that "he had used his [nine]-millimeter handgun to shoot Bettencourt and that on the day after the Morris shooting he had thrown the gun off the Dumbarton Bridge." *Id.* These incriminating statements should not have been admitted into evidence, however, because they were unlawfully obtained after Cook's invalid *Miranda* waiver. Therefore, the state trial court had no legitimate justification or good cause to try these otherwise unrelated murders together. *Lane*, 474 U.S. at 446 n. 8 ("[M]isjoinder would rise to the level of a

constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."); *Bean*, 163 F.3d at 1084 (holding that defendant was highly prejudiced by the improper joint trial of otherwise unrelated crimes).

Moreover, "there was no cross-admissibility between [the Sadler] murder and the [Bettencourt and Morris murders]" because Sadler was beaten rather than shot.[4] *Cook*, 139 P.3d at 505. Therefore, in order to affirm the trial court's denial of Cook's motion to sever the trial for the Sadler murder, the California Supreme Court, on direct appeal, had to summarily conclude that the joinder of the Sadler murder did not prejudice Cook because the Bettencourt and Morris murders had already been properly joined into a single trial. *Id.* But the Morris and Bettencourt murders were improperly joined using Cook's unlawfully obtained confession and other incriminating statements, so the additional joinder of the Sadler murder—for which there was no cross-admissibility of evidence—was also improper and highly prejudicial.

The reason the consolidation of the three unrelated murders into a single trial was harmful is that "the jury could not 'reasonably [have been] expected to compartmentalize the evidence so that evidence of one crime [did] not taint the jury's consideration of another crime.'" *Bean* 163 F.3d at 1084 (quoting *Johnson*, 820 F.2d at 1071); *United States v. Douglass*, 780 F.2d 1472, 1479 (9th Cir. 1986) (same). We have long observed that "[i]t is much more difficult for jurors to compartmentalize damaging information about one

---

[4] Shawnte Early identified Cook as the man who repeatedly shot Bettancourt and who beat Sadler with a stick. *Cook*, 139 P.3d at 505–06. However, she repudiated her pretrial statements on the stand. *Id*.

defendant derived from joined counts, than it is to compartmentalize evidence against separate defendants joined for trial." *Lewis*, 787 F.2d at 1322. Indeed, studies show that "joinder of counts tends to prejudice jurors' perceptions of the defendant and of the strength of the evidence on both sides of the case." *Id.* Cook was entitled, under the Fifth Amendment, to three separate trials precisely to ensure that the jury in each of those trials was able to fairly evaluate the evidence of each unrelated murder, and not be prejudiced by their inability to compartmentalize the cumulative evidence of the other two murders. *See Bean*, 163 F.3d at 1084 ("As the joinder of the [] charges did in fact prejudice [the defendant's] trial on the latter counts, we conclude that [the defendant's] due process rights were violated.").

Indeed, the jurors in Cook's case admit, in no uncertain terms, that they were unable to compartmentalize the evidence because their perception of it was tainted by Cook's unlawfully obtained confession to the Bettencourt murder and his incriminating statements about the Morris murder. One juror stated: "[Cook] admitted to one of the killings, so it seemed likely that he had done the other two." Another confirmed that "[a]fter hearing from all of these witnesses in the guilt phase, we heard Walter's confessions about his involvement in the crimes," notably failing to distinguish between the Bettencourt murder and the other two murders. In order to find that the admission of Cook's confession and other incriminating statements was harmless, the state habeas court would have had to unreasonably ignore these deeply troubling statements from the jury.

Accordingly, because the jury unfairly considered the cumulative evidence against Cook—rather than compartmentalizing the evidence for each unrelated

murder—no fairminded jurist would disagree that the trial court's use of Cook's confession to consolidate the three unrelated murders into a single trial had a "substantial and injurious effect or influence in determining the jury's verdict." *Bean*, 163 F.3d at 1086 (quoting *Brecht*, 507 U.S at 637). This impermissible joinder, on its own, is sufficient to establish prejudice for purposes of granting Cook habeas relief.

### b. The admission of Cook's confession and other incriminating statements was harmful because the other evidence against Cook was inconclusive or highly compromised.

Even assuming the improper misjoinder of the three unrelated murders into a single trial did not prejudice Cook, the admission of his unlawfully obtained confession and other incriminating statements was not "harmless error" because the other evidence against Cook was most likely insufficient for the jury to convict him. *Fulminante*, 499 U.S. at 297 (reversing conviction and ordering a new trial because "[o]ur review of the record leads us to conclude that the State has failed to meet its burden of establishing, beyond a reasonable doubt, that the admission of [defendant's] confession [] was harmless error"); *Martinez v. Cate*, 903 F.3d 982, 999 (9th Cir. 2018) ("[Defendant's] improperly-admitted statements were clear and damning; they were the backbone of the State's argument against self-defense. Thus, we have grave doubts that their admission did not affect the verdict."); *Anderson*, 516 F.3d at 792 (9th Cir. 2008) (holding that "the error was not harmless[,]" because "[t]he confession was central to the conviction" (citing *Brecht*, 507 U.S. at 623, and then citing *Fulminante*, 499 U.S. at 296)).

I will explain in turn how the other evidence of Cook's guilt for each of the three murders was inconclusive and highly compromised.

### i.   *The Sadler murder*

For the Sadler murder, most of the evidence was inconclusive or highly compromised.  For example, the three bystanders who testified against Cook—Ernest Woodard, Shawnte Early, and Velisha Sorooshian—admitted that they were coerced and threatened by the police in exchange for their testimony incriminating Cook.  Their testimony was also inconclusive.  Woodard never testified that he saw Cook beat Sadler to death with a stick.  *Cook*, 139 P.3d at 500–01.  Early recanted at trial, testifying that she did not remember making the statement accusing Cook, that the statement was untrue, and that the police coerced her to make it.  Similarly, Sorooshian admitted at trial that she could not remember the details of her interview with detectives because she "ha[d] been on crack so long."

The only other testimony against Cook was that of Shannon Senegal, who claims that Cook told him he beat up Sadler the day after the murder.  But Senegal's testimony is highly unreliable given that he was a suspect to the Morris killing, which means he had a strong incentive to see Cook take the blame for both crimes.  *Cook*, 139 P.23d at 501.  In fact, Senegal's charge as an accessory to the Morris murder was dropped for a misdemeanor count of giving false information to a peace officer in exchange for his statement incriminating Cook in the Sadler murder.

There was also substantial forensic and testimonial evidence that Thomas Young and his cousin Kenny Young, not Cook, killed Sadler.  Frankly, given this evidence, it is baffling that the detectives investigating the Sadler murder

failed to interview Thomas Young until May 2, 1994—over two years after Sadler's death, and sixteen days into Cook's trial. Detectives never interviewed Kenny Young. This means that the jury was never presented with the available evidence against all the credible suspects to the murder; they were only presented with highly compromised evidence of Cook's alleged involvement.

Considering these serious evidentiary pitfalls, fairminded jurists would have to agree that the jury had to rely on Cook's improperly admitted confession and other incriminating statements to convict Cook of the Sadler murder.

### ii. The Bettencourt murder.

Virtually every piece of evidence of the Bettencourt murder is either inconclusive or highly compromised. For example, Tamika Asburry, Shawnte Early, Teresa Beasley, and Darnell Earby, who gave statements to the police identifying Cook as Bettencourt's shooter, later recanted at trial, stating that their statements had been coerced and reflected what the police wanted them to say. Nathan Gardner and Keith Johnson also testified that they saw Cook shoot Bettencourt. However, their testimony was inconclusive because both witnesses initially admitted they could not definitely identify Cook as Bettencourt's shooter, even though they both later testified that they did see Cook shoot Bettencourt. Importantly, Gardner and Johnson received lenient plea deals in unrelated charges for violent drug crimes as a result of their testimony against Cook.

The other witness who accused Cook of shooting Bettencourt was Sims, who was the only other suspect to the murder. Sims admitted that he was also on the scene selling crack, and he was kneeling inside the victim's car (where he

allegedly dropped a crack rock) moments before the shooting began. In fact, there is compelling ballistics evidence suggesting that the first shot could only have come from Sims's location, and that because every shot came from the same gun, there is at least some probability that Sims, not Cook, shot Bettencourt.

Moreover, although Sims testified on the stand that he hoped to receive a lighter sentence for his multiple parole and drug charges in exchange for his testimony against Cook, he neglected to share with defense counsel and the jury that he had *already* received a very generous deal. In fact, Inspector Sabin wrote to the Board of Prisons to ensure that Sims was released on his own recognizance from a prison sentence for parole violations on two occasions—July 1992 and May 1993. After Sims violated the terms of his supervised release a *third time*, his probation officer, Timothy Gatto, had to write to the San Mateo Superior Court seeking a bench warrant, describing Sims as "clearly out of control" and noting that "his veracity is questionable in all matters." Ultimately Sims secured a two-year get-out-of-jail-free pass for his multiple parole violations and drug offenses in exchange for his testimony incriminating Cook. It is thus extremely problematic that the prosecution only turned over Sabin's letters to the Board of Prisons *after* Sims' trial testimony, and never turned over Gatto's letter. Had the prosecution turned over this key evidence showing that Sims received special treatment in exchange for his testimony against Cook, there is a reasonable probability that the jury would have concluded that Sims seriously lacked credibility. But the opposite happened. One of the jurors explained that "there was one guy in particular we really liked, a young man named Jap [Sims's nickname]," who "wanted to help the police with the case because he was trying to turn his life around."

Therefore, the district court correctly found that the witness statements identifying Cook as the Bettencourt shooter were "compromised," either due to alleged police misconduct in feeding details or threatening the witnesses, or because the witness was also a suspect and thus had a motive to fabricate.  Without the confession to the Bettencourt murder, it is highly likely that the jury would have viewed this evidence in a substantially less prejudicial way.

### iii.  The Morris murder.

The evidence for the Morris murder is even more problematic.  Two of the witnesses who testified that they saw Cook shoot Morris—Lavert Branner and Shannon Senegal—were themselves suspects and granted leniency by the prosecution for testifying against Cook.[5]  Furthermore, there was strong forensic and testimonial evidence that Branner or Senegal killed Morris, including testimony from Monique Barrett, Lakishain Smith, and Tasha Bradford.

In sum, the evidence against Cook for the Sadler, Bettencourt, and Morris murders was so lacking that there is "more than a 'reasonable possibility' that" the admission of Cook's confession to the Bettencourt murder and other incriminating statements about the Morris murder was "harmful" under *Brecht*.  *Ayala*, 135 S. Ct. at 2198 (quoting 507 U.S. at 637).  The prosecution's case for all three murders was otherwise flimsy and weak.  In fact, without Cook's unlawfully obtained confession and other

---

[5] It is highly problematic that the police waited over a year to interview Branner and Senegal about the Morris killing given that they were both natural suspects.  The police spoke with Branner for the first time in November 1993, and with Senegal in March 1994.

incriminating statements, the remaining evidence consists of recanted, coerced, or otherwise compromised testimony, and inconclusive ballistics evidence. Therefore, "absent the confessions, it is unlikely that [Cook] would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict." *Fulminante*, 499 U.S. at 297.

Furthermore, because the trial court admitted the unlawfully obtained confession and other incriminating statements, Cook's defense counsel was forced to acknowledge that Cook shot Bettencourt, focusing their efforts instead on establishing that Bettencourt's killing was at most second-degree murder because Cook had been drinking heavily. *Cook*, 139 P.3d at 502. In other words, had the confession and statements not been admissible, the defense would not have had to acknowledge that Cook shot Bettencourt. It is thus highly likely that Cook's defense counsel would have attempted to convince the jury that Cook did not shoot Bettencourt, especially because the prosecution's case was otherwise unconvincing.

Cook's wrongfully admitted confession and other incriminating statements were highly prejudicial.[6] In *Fulminante*, the Supreme Court warned us, in no uncertain terms, that we must "exercise extreme caution before determining that the admission of a confession at trial was harmless," because confessions "may tempt the jury to rely upon that evidence alone in reaching its decision." 499 U.S. at 296. Here, the inconclusive and highly compromised

---

[6] Judge Callahan filed a concurrence, in which Judge Smith did not join, arguing that "the state habeas court could have reasonably denied Cook's claim on the basis that the admission of his confession did not prejudice him at trial."

evidence in the record, coupled with the deeply troubling post-trial statements of the jurors, give me—and should give this Court—"grave doubt about whether [the impermissible admission of Cook's unlawfully obtained confession and other admissions] had a substantial and injurious effect or influence in determining the jury's verdict." *Ayala*, 135 S. Ct. at 2197–98 (quoting *O'Neal*, 513 U.S. at 436).

## 4. Conclusion

Cook is entitled to habeas relief because the California Supreme Court's summary ruling that he intelligently and knowingly waived his *Miranda* rights involved an unreasonable determination of the facts and an unreasonable application of clearly established federal law, given that he was not—indeed he could not be—"full[y] aware[] of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Thompkins*, 560 U.S. at 384 (quoting *Burbine*, 475 U.S. at 421).

Furthermore, the record clearly shows that the admission of Cook's unlawfully obtained confession to the Bettencourt murder and incriminating statements about the Morris murder were harmful.  First, the admission of these unlawfully obtained incriminating statements resulted in a fundamentally unfair joint trial of the three unrelated murders of Sadler, Bettencourt, and Morris, during which the jury failed to compartmentalize the evidence for each crime, violating Cook's due process rights.  Second, the record highlights that the prosecution's other evidence of Cook's guilt was inconclusive or highly compromised, which led the jury to rely heavily on Cook's unlawfully obtained incriminating statements to convict him.

Accordingly, I respectfully dissent.